UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID G. VALLEY,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>BRIAN L. MARTIN, et al.,<br><br>　　　　Defendants. | Case No. 16-cv-00870-HSG (PR)<br><br>**ORDER GRANTING DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 26 |

**INTRODUCTION**

On February 22, 2016, Plaintiff filed this *pro se* civil rights action under 42 U.S.C. § 1983 against two defendants at Lake County Jail, where he was previously housed as a pretrial detainee. Defendants are Lake County sheriff Brian Martin and Lake County lieutenant Findley. On April 25, 2016, the Court screened the complaint and found that it stated a cognizable Due Process claim based on Plaintiff's allegations that he endured cold temperatures during his time at Lake County Jail.

Now before the Court is Defendants' motion for summary judgment. Plaintiff has filed an opposition, and Defendants have filed a reply. For the reasons discussed below, the motion will be granted.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

In December 2015, Plaintiff began filing inmate grievances requesting that inmates at Lake County Jail be given additional clothing due to cold temperatures. Plaintiff specifically requested a sweatshirt and beanie cap, as well as an extra blanket. Dkt. No. 26-3 at 8-11. On December 25, 2015, Lake County sergeant Monreal responded to the grievances, indicating that the jail's

clothing policy was "consistent with Title 15 minimum standards for local jail." *Id.* at 13. Sergeant Monreal further indicated that the heating in Plaintiff's pod was "adequate as it relates to weather conditions." *Id.*

On December 28, 2015, Plaintiff filed two additional inmate grievances, both of which were received by Defendant Lt. Findley. Findley Decl. Exs. A, B. In one, Plaintiff requested a sweatshirt and beanie to "ward off cold of exercise yard." Findley Decl. Ex. A. Plaintiff indicated that the temperature that day was 47 degrees, and he stated. "I cannot tolerate exercise without ability to stay warm." *Id.* Lt. Findley responded on January 14, 2016 stating, "We do not provide jackets or sweatshirts to medium or maximum inmates. The reason for this is based upon security concerns." *Id.*

In the second grievance Plaintiff filed that day, he indicated that his cell, along with some other cells in the maximum security pod, were not being heated and estimated that the temperature was 60 degrees "on a good day." Findley Decl. Ex. B. Plaintiff also noted that a correctional officer, whom he identified as C/O Bestgrow, was aware of the problem but had not resolved it. *Id.* Lt. Findley responded on January 14, 2016 stating, "I have submitted a maintenance request." *Id.*

As a result of Plaintiff's appeal concerning his cell temperature, Lt. Findley immediately contacted maintenance staff. Findley Decl. ¶ 6. Maintenance staff informed Lt. Findley that they would check all of the vents and ducts in Plaintiff's cell and also indicated they would order an extra infrared heat gun to check cell temperatures. *Id.* On January 14, 2016—the same day—maintenance staff informed Lt. Findley that the propane tank had run empty. *Id.* However, the situation was remedied, and maintenance staff informed Lt. Findley on January 15, 2016, that all cells were back to their correct temperatures and that Plaintiff's cell temperature was between 68 and 71 degrees. *Id.* ¶¶ 6, 8. As a result of learning the propane had run out, Lt. Findley instituted new procedures whereby propane was checked every day or two instead of every week. *Id.* ¶ 7.

On January 24, 2016, Plaintiff filed another inmate grievance. Findley Decl. Ex. D. Plaintiff stated that on January 19, 2016, his cell heater came on and heated his cell nicely for twenty-four hours but that as of the time of filing his cell did not have adequate heat. *Id.* Lt.

2

Findley responded on January 26, 2016, stating "Maintenance took more than one sampling from your cell. I will be having staff take random samples of a couple cells in Pod C." *Id.* Lt. Findley learned from one of the correctional officers that the issue with Plaintiff's cell was the night-time temperature. Findley Decl. ¶ 8. Based on that information, Lt. Findley assigned an officer to check cell temperatures at night, specifically at both 10:00 p.m. and 3:00 a.m. Between January 26 and January 31, 2016, temperature readings showed that, even at night, Plaintiff's cell averaged around 66 degrees. Findley Decl. ¶ 8 & Ex. C. The coldest temperature recorded was 63.6 degrees, with the temperature being over 65 degrees most of the time. *See id.*[1]

Without filing any further inmate grievances or appeals, Plaintiff filed the instant action on February 22, 2016. Findley Decl. ¶ 10. It appears that Plaintiff left Lake County Jail soon thereafter, as he was convicted in state court on February 23, 2016. *See* Mot. Summ. Jud. at 2:25-27.[2]

Only one other inmate at Lake County Jail, Jeffrey Happ, has filed a grievance about his cell temperature. Findley Decl. ¶ 13. Happ filed a petition for writ of habeas corpus regarding his cell temperature in state court. *Id.* On April 5, 2016, the Lake County Superior Court denied the petition. Dkt. No. 26-3 at 4-5. The court stated, in pertinent part:

> On April 5, 2016, a hearing was held on the petition. The response, the reply and the testimony at the hearing show that, on one occasion the heating system failed because the propane tank ran empty. In response, the sheriff's office has since changed its practice from checking the propane tank once per week to checking it every day or two. The problem has not recurred. The heating system, which is less than two years old, has maintained the exterior wall temperature in the mid-sixties throughout the winter months. The heater is kept at 70 degrees. For two to three minutes when the heater first turns on, it blows cold air. Petitioner [Happ] testified that there have not been recent heating problems.

---

[1] Plaintiff objects to this evidence as "improper opinion." *See* Dkt. No. 29 at 24. The challenged evidence is documentation of objective readings of cell temperatures as measured by a third party using an infrared gun and is not personal opinion. Plaintiff's objection is therefore OVERRULED. All remaining evidentiary objections are OVERRULED as moot because the evidence challenged is not pertinent to the Court's analysis.

[2] It appears from Plaintiff's latest notice of change of address that he is no longer in custody. *See* Dkt. No. 31.

3

*Id.*[3]

**DISCUSSION**

**I.  Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).  The nonmoving party must show more than "the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252).  "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Liberty Lobby,* 477 U.S. at 252).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

For purposes of summary judgment, the court must view the evidence in the light most

---

[3] Defendants' request that the Court take judicial notice of plaintiff's inmate grievances and the state court order denying Jeffrey Happ's habeas petition, Dkt. No. 26-3, is GRANTED.

4

favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Plaintiff's verified complaint (Dkt. No. 1) and Plaintiff's declaration in support of his opposition to summary judgment (Dkt. No. 29-1) are considered in evaluating the motion for summary judgment.

## II. Analysis

### A. Defendant Findley

Plaintiff claims that Defendant Findley violated the Due Process Clause of the Fourteenth Amendment by subjecting Plaintiff to cold cell temperatures and by denying his request for extra clothing to use while exercising outdoors. Defendant Findley argues he is entitled to summary judgment based on qualified immunity, in addition to denying that he committed any constitutional violation. Defendant Findley also argues that Plaintiff failed to exhaust administrative remedies as to his cell temperature claim.

#### 1. Qualified Immunity Legal Standard

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether an officer is entitled to qualified immunity, the Court must consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

With respect to the second prong of the qualified immunity analysis, the Supreme Court has held that "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate." *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (omission in original) (internal quotation marks omitted). This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted). In conducting this analysis, the Court must determine whether the pre-existing law provided Defendant Findley with "fair notice" that his conduct was unlawful. *Sheehan*, 135 S. Ct. at 1777.

### 2. Cell Temperature

Defendants' undisputed evidence shows that after Lt. Findley was put on notice of Plaintiff's complaints of cold cell temperatures, he immediately called on maintenance staff to

6

investigate the issue. On January 14, 2016, Lt. Findley learned that the propane tank had run empty. By the next day, maintenance staff had repaired the issue and had heated Plaintiff's cell. Lt. Findley ordered that regular temperature readings be taken after that point and learned that average nighttime temperatures for Plaintiff's cell were over 65 degrees.

Plaintiff claims in his affidavit that temperature readings in his cell ranged from 42 to 66 degrees, but that a "wind chill factor from forced air unheated" brought the actual temperature ten degrees lower. Dkt. No. 29-1 at ¶ 8. He does not state that he had a thermometer or other instrument with which to measure his cell temperature. The Court therefore cannot say that Plaintiff's numbers are supported by the record. Rather, these numbers are simply assertions by Plaintiff without evidentiary support. "[C]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (quoting *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993)). Indeed, Plaintiff does not specify the timeframe during which his cell temperatures allegedly fell this low. He merely states that the 42–66 readings were taken "during administrative remedies," but later states that the grievance submitted to Defendant Findley was his "final level grievance." Dkt. No. 29-1 at ¶¶ 8, 11. The temperature readings taken after Defendant Findley became involved are part of the summary judgment record and show temperatures between 63.6 and 68.5, with the temperature being over 65 degrees most of the time. *See* Findley Decl. Ex. C. In any event, the undisputed evidence shows Lt. Findley was working to remedy the situation by promptly responding to Plaintiff's grievances, calling in maintenance staff, following up with maintenance staff, and ordering regular temperature and propane checks.

The record shows that Lt. Findley acted promptly to resolve temperature issues once he received Plaintiff's December 28, 2015 grievance. To the extent Plaintiff complains about cell temperatures prior to the filing of this grievance, he offers no evidence that Lt. Findley was responsible for the cell temperatures, or even that Lt. Findley was put on notice of the cell temperatures. Fellow inmate Jeffrey Happ confirmed in state court proceedings that temperature issues had been resolved. Plaintiff does not dispute that he had a blanket. He claims that his request for additional blankets was denied (Dkt. no. 29-1 at ¶ 6), but he does not relate this in any

7

way to Lt. Findley. Further, while he claims medical ailments—specifically back pain and spasms—from the cold, the medical records he submits do not provide any indication that his ailments were due to exposure to cold temperatures. *See* Dkt. No. 29-2 at 10, 22, 30, 32. In fact, they show that he had pre-existing back issues. *See id.*

In sum, the record shows that Lt. Findley acted promptly to resolve temperature issues, he did so within days, and he continued regular temperature checks and changed policy to ensure more frequent propane checks. Based on pre-existing law, it would not have been clear to a reasonable official in his position that anything more was required. *See Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("[T]he Constitution does not mandate comfortable prisons."); *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (affirming summary judgment for defendants where plaintiff alleged only that average temperatures in his cell "tend[ed] to be either well above or well below room temperature . . . which suggest[ed] only that the temperature was not comfortable"); *Poole v. Taylor*, 466 F. Supp. 2d 578, 587 (D. Del. 2006) (finding pretrial detainee's due process rights were not violated when he was required to sleep on mattress on floor for over six months in overcrowded facility that experienced sporadic hot and cold temperatures and insect and rodent infestations, where prison officials issued numerous work orders for temperature repairs and pest control, and there was no evidence of intention on officials' part to punish detainee); *Skelton v. Bruce*, 409 F. App'x. 199 (10th Cir. Nov. 3, 2010) (unpublished) (finding prison officials were not deliberately indifferent to inmate's health or safety based on purportedly cold temperature in his prison cell where official responded to inmate's grievance by checking temperature with maintenance and confirming that heater had been set to 68 degrees).

Accordingly, Defendant Findley is entitled to summary judgment on Plaintiff's cell temperature claim.[4]

---

[4] Because the Court finds Lt. Findley is entitled to qualified immunity on Plaintiff's cell temperature claim, it need not address Defendants' alternative arguments with respect to this claim.

8

### 3. Extra Clothing

Regarding Plaintiff's claim that Lt. Findley denied him extra clothing for outdoor exercise, there is no clearly established law requiring jail or prison officials to provide prisoners special clothing for exercise. *See Nelson v. Cal. Dep't. of Corr.*, No. C 02-5476 SI (PR), 2004 WL 569529, at *9 (N.D. Cal. Mar. 18, 2004), *aff'd sub nom. Nelson v. Lamarque*, 131 F. App'x. 549 (9th Cir. May 13, 2005) (unpublished) ("Although the law was clearly established that depriving an inmate of outdoor exercise on a long-term basis violated the Eighth Amendment, and although the law was clearly established that depriving an inmate of adequate clothing violated the Eighth Amendment, the law was not very well fleshed out on amount of clothing required to avoid an Eighth Amendment violation.").

While the law is clear that prisoners must be provided opportunities for exercise,[5] the facts showing that Plaintiff was afforded opportunities for exercise are undisputed. Although Plaintiff disputes Defendants' assertion that inmates were permitted to exercise indoors in the dayroom, Dkt. No. 29-1 at ¶ 7, he concedes that he was allowed to exercise outdoors. There is no evidence that during the months in question, Lake County experienced extreme cold or other harsh weather conditions such that outdoor exercise was effectively unavailable. Meteorological records for Lake County show that the average outdoor mean temperature in December 2015 was 46 degrees,[6] and the average outdoor mean temperature in January 2016 was 49 degrees.[7] Average temperatures during the day—i.e., when inmates would be exercising outdoors—were almost certainly higher. For example, on December 16, 2015, afternoon temperatures reached 55 degrees,[8] and on January 16, 2016, afternoon temperatures reached 57 degrees.[9] Even on days

---

[5] *See LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993).

[6] https://www.wunderground.com/history/airport/KUKI/2015/12/1/MonthlyHistory.html?req_city=Lakeport&req_state=CA&req_statename=California&reqdb.zip=95453&reqdb.magic=1&reqdb.wmo=99999

[7] https://www.wunderground.com/history/airport/KUKI/2016/1/1/MonthlyHistory.html?req_city=Lakeport&req_state=CA&req_statename=California&reqdb.zip=95453&reqdb.magic=1&reqdb.wmo=99999

[8] https://www.wunderground.com/history/airport/KUKI/2015/12/16/DailyHistory.html?req_city=Lakeport&req_state=CA&req_statename=California&reqdb.zip=95453&reqdb.magic=1&reqdb.wm

9

where daytime temperatures were in the forties, correctional officers could reasonably rely on the fact that inmates would be exercising to stay warm. If there were occasional days of extreme cold, officials would have been excused from providing outdoor exercise on those days. *See Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (a prisoner in long-term and continuous segregation must be provided regular outdoor exercise "unless inclement weather, unusual circumstances, or disciplinary needs" make it impossible). Plaintiff does not claim that he was ever forced to go outside. At most, the record shows that he his options were either to exercise outdoors like everyone else or to stay indoors and forgo exercise. This does not amount to the deprivation of a constitutional right.

Plaintiff's own medical reports submitted with his opposition show that he was exercising during the period in question. *See* Dkt. No. 29-2 at 30 (medical staff noting Plaintiff "is exercising to cope with stress/anxiety"). Plaintiff does not allege that the outside temperature was objectively too cold for exercise, and he certainly does not allege that the outside temperature was freezing. Rather, he states that it was too cold for him personally. *See* Findley Decl. Ex. A (Plaintiff's inmate grievance stating "I cannot tolerate exercise without ability to stay warm.").

Further, the undisputed facts show that Lt. Findley was simply following jail policy in denying additional clothing. Lt. Findley states in his declaration that the policy against providing outer clothing "has been necessary to protect correctional officers." Findley Decl. ¶ 3. He further explains that "outer clothing such as sweatshirts, beanies and other such clothing can allow the inmates to hide contraband, weapons and other materials and, more important, can even allow the prisoners to stuff protective material in their clothing so as to create body armor that lessens the effectiveness of devices used by jail personnel to subdue prisoners under circumstances where appropriate control has to be exercised by jail staff." *Id.* ¶ 2. Nothing in the record suggests that Lt. Findley applied this policy to Plaintiff any differently than he did to other inmates.

---

[9] o=99999

https://www.wunderground.com/history/airport/KUKI/2016/1/16/DailyHistory.html?req_city=Lakeport&req_state=CA&req_statename=California&reqdb.zip=95453&reqdb.magic=1&reqdb.wmo=99999

10

In sum, given the circumstances, it would not have been clear to a reasonable official in Lt. Findley's position that anything more was required. *Walker v. Sumner*, 14 F.3d 1415, 1421 (9th Cir. 1994) (inmate who did not receive a jacket did not allege Eighth Amendment violation because he did not allege that the weather conditions were such that the deprivation of a jacket inflicted pain of constitutional magnitude), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 483-84; *Nelson*, 2004 WL 569529 at *7-10 (finding plaintiff inmate failed to show prison officials acted with deliberate indifference and officials were entitled to qualified immunity on plaintiff's claims that he was required to live and exercise in inadequate clothing); *Prendota v. Walker*, No. C 06-1207, 2009 WL 722576, at *4 (C.D. Ill. Mar. 18, 2009) ("defendants have provided adequate evidence that they do not allow inmates to layer their clothing due to security concerns, a valid penological interest").

Accordingly, Defendant Findley is entitled to summary judgment on Plaintiff's clothing claim.[10]

### B. Defendant Martin

Plaintiff has also failed to raise a triable issue of fact on his claim that Defendant Lake County sheriff Brian Martin violated Plaintiff's constitutional rights. It is undisputed that Sheriff Martin was not involved in setting the temperature in Plaintiff's cell or responding to Plaintiff's grievances regarding temperature and clothing. His liability would stem only from his actions as a supervisor. A supervisor may be liable under § 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Henry A. v. Willden*, 678 F.3d 991, 1003-04 (9th Cir. 2012). Because there was no clearly established authority showing a constitutional violation on the part of Defendant Findley, the Court finds that Defendant Martin cannot be liable for participating in, directing, or failing to act to prevent any alleged constitutional violation. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 675-84 (2009) (supervisor defendants are entitled to qualified immunity where the allegations against them are simply "bald" or "conclusory" because such

---

[10] Because the Court finds Lt. Findley is entitled to qualified immunity on Plaintiff's clothing claim, it need not address Defendants' alternative arguments with respect to this claim.

allegations do not "plausibly" establish the supervisors' personal involvement in their subordinates' constitutional wrong). Accordingly, Defendants' motion for summary judgment as to Sheriff Martin is GRANTED

### C. Official Capacity Claims

Plaintiff sues Defendants Findley and Martin in both their individual and official capacities. Any official capacity claim against defendants must be treated as a claim against Lake County, requiring Plaintiff to establish that his alleged injury was caused by the Defendants acting pursuant to an unconstitutional policy or longstanding practice or custom. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143, 1151 (9th Cir. 2011). There is no evidence of any such unconstitutional policy, practice, or custom. Accordingly, Defendants are entitled to summary judgment on Plaintiff's official capacity claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk shall enter judgment for Defendants and close the file.

This order terminates Docket No. 26.

**IT IS SO ORDERED.**

Dated: 9/21/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge